IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SYCAMORE COMPANIES, LLC,<br><br>Defendant. | COMPLAINT<br><br>Civil Action No. 1:23-cv-347 |

**COMPLAINT**

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, and acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

**NATURE OF ACTION AND OVERVIEW**

1. This is a civil action brought by the United States against the Defendant under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675. Specifically, the United States brings this action under CERCLA Section 104(e), 42 U.S.C. § 9604(e), seeking a court order granting EPA access to real property owned by Defendant Sycamore Companies, LLC ("Sycamore") for the purposes of determining the need for CERCLA response actions, or choosing or taking CERCLA response actions, at that property.

2. Sycamore operates a used car business on land it owns at 4401 North Keystone Avenue, Indianapolis, Indiana ("Property"), a 1.4-acre parcel that is contaminated with chlorinated volatile organic compounds ("VOCs") that have been identified as CERCLA

1

hazardous substances. The Property is in the northeast quadrant of the Keystone Corridor Groundwater Contamination Site ("Keystone Corridor Site") in Indianapolis, which EPA listed on the National Priority List of the nation's highest risk Superfund sites in 2013. EPA has determined that the Property is the primary source area of VOCs that have contaminated soil and groundwater at and around the Keystone Corridor Site and has led to vapor intrusion in the surrounding residential neighborhoods.

3. EPA prepared a Record of Decision for a remedial action to manage the contamination and sought access to the Property to execute the remediation, but Sycamore has refused to provide EPA access at various times.

4. Considering the circumstances summarized here, and as outlined in greater detail below, the United States seeks an order in aid of access to Sycamore's Property under CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), for the purpose of preparing for and executing a remedial action.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action and personal jurisdiction over the Defendant under CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1331 and 1345.

6. Venue is proper in this judicial district pursuant to 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of a hazardous substance or substances that gives rise to this claim occurred and is occurring in this district and because Defendant's Property is located within this district.

## THE DEFENDANT AND ITS PROPERTY

7. Sycamore is an Indiana domestic limited liability company which has given the Indiana Secretary of State formal notice of its intent to operate under the assumed business name "Honest Abe Auto Sales." Ibrahim Saad Alfaran is Sycamore's President, Registered Agent, and sole Member.

8. Sycamore owns the Property located at 4401 North Keystone Avenue, Indianapolis, Indiana 46205. The Property is used as a retail sales location for Honest Abe Auto Sales.

9. Sycamore purchased the Property through a quitclaim deed on January 13, 2016. Sycamore remains the owner of record for the Property, according to Marion County records.

10. When Sycamore purchased the Property in 2016, it was an undeveloped vacant lot.

11. The Property currently consists of two auto sales parking lots, a sales office building, and a smaller building that appears to be used as a repair garage. The office building is roughly 1500 square feet, and it sits in the center of the lot with the two parking lots on either side. The garage is roughly 1120 square feet and sits in the south-west corner of the lot.

## STATUTORY BACKGROUND

12. Whenever there is a release or substantial threat of release of a hazardous substance into the environment, EPA "is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or take any other response measure consistent with the national contingency plan" that EPA deems necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a)(1).

13. CERCLA Section 104(e), 42 U.S.C. § 9604(e), grants officers, employees, or duly designated representatives of EPA authority for information gathering and access. Where there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant, CERCLA authorizes EPA "to enter at reasonable times" any vessel, facility, establishment, or other place or property that falls into one or more of the following categories: (A) "where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed or transported from"; (B) "from which or to which a hazardous substance or pollutant or contaminant has been or may have been released"; (C) "where such release is or may be threatened"; and (D) "where entry is needed to determine the need for a response or the appropriate response or to effectuate a response action under this subchapter." 42 U.S.C. §§ 9604(e)(1), 9604(e)(3).

14. EPA may exercise this authority to enter "for the purposes of determining the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter." 42 U.S.C. § 9604(e)(1).

15. CERCLA Section 104(e) authorizes the United States to commence a civil action to compel compliance with a request for access. 42 U.S.C. § 9604(e)(5)(B). The statute provides that, where there is a reasonable basis to believe there may be a release or threat of a release of a hazardous substance, pollutant, or contaminant, the court "shall enjoin" interference with an EPA request or order for entry "unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 9604(e)(5)(B)(i).

16. CERCLA, 42 U.S.C. § 9604(e)(6), provides that nothing in CERCLA Section 104(e) shall preclude EPA from securing access in any other lawful manner.

## GENERAL ALLEGATIONS

**The Contamination and the Initial Cleanup Actions at the Property and the Keystone Corridor Site**

17. A business called Tuchman Cleaners operated at the Property from at least 1953 until 2008. When it occupied the Property, the Tuchman Cleaners dry cleaning business contaminated the soil and groundwater with releases of dry cleaning solvents such as tetrachlorethylene (also known as perchloroethylene or "PCE") and its chemical breakdown products including trichloroethylene ("TCE"), *cis*-1,2-dichloroethylene ("DCE"), and vinyl chloride (collectively referred to in this Complaint as "PCE and its breakdown products").

18. PCE and its breakdown products are VOCs that evaporate easily into the air from their liquid states. When PCE and its breakdown products contaminate soil, they can evaporate and migrate upwards into and through overlying buildings through gaps, cracks, pipes, vents, and other spaces, contaminating indoor air and ambient air in and around buildings. This phenomenon is called vapor intrusion.

19. Long-term exposure to low-level concentrations of PCE—e.g., via the inhalation of PCE vapors—can have adverse neurological effects, including loss of color vision and impaired cognitive and motor function, such as changes in mood, memory, attention, and reaction time. Exposure to PCE could also lead to higher risk of cancer, birth defects, and liver and kidney damage.

20. TCE is a volatile, colorless liquid chemical. TCE is moderately soluble, meaning that it dissolves into water easily, and thus, TCE found in soil can easily migrate into groundwater. Drinking even small amounts of TCE for long periods of time may cause liver and kidney damage, impaired immune system function, and impaired fetal development. TCE can also exist in ambient air. Breathing small amounts of TCE may cause headaches, lung irritation,

dizziness, poor coordination, and difficulty concentrating; large amounts of TCE may cause impaired heart function, unconsciousness, and death.

21. Breathing air or drinking water contaminated with vinyl chloride can cause an array of adverse health effects. Vinyl chloride has been classified as a known carcinogen based on studies of humans and animals exposed to the chemical. Exposure to vinyl chloride also can cause dizziness, skin damage, nerve damage, liver damage, and immune system reactions.

22. TCE, PCE, DCE, and vinyl chloride all are classified as "hazardous substances" under CERCLA, as reflected in the list codified at 40 C.F.R. § 302.4.

23. In 1989, the Indiana Department of Environmental Management ("IDEM") began investigating soil and groundwater contamination coming from the Property after detecting elevated levels of VOCs in soil samples. In 1990, IDEM installed a soil vapor extraction system and a groundwater pump and treat system, which successfully removed between 162 and 217 kilograms of VOCs from the Property over 6 years.

24. In 2003, IDEM installed a well on the Property intended to capture sub-surface chemical contamination in the form of dense non-aqueous phase liquids ("DNAPL"), recovering around 900 kilograms of DNAPL in three years. In 2009 and 2011, an IDEM site investigation revealed elevated levels of PCE and TCE in soil and groundwater samples at the Property, along with vinyl chloride in a municipal drinking water well immediately down-gradient from the Property. As a result of finding the vinyl chloride, IDEM took the drinking well out of service. IDEM then requested EPA assistance with a removal action at the Property.

25. In 2012, the City of Indianapolis razed all the structures at the Property and bulldozed the land to grade in preparation for EPA removal activities planned under CERCLA. Mainly between 2012 and 2014, those EPA's removal activities targeted the most immediate

threats posed by the environmental conditions at and near the Property, including excavating and replacing contaminated near-surface soils that posed a direct contact hazard and installing vapor intrusion mitigation systems at more than 20 nearby residential properties.

26. EPA recognized that its removal activities would not fully address all threats posed by remaining environmental contamination in the area, and EPA determined that more permanent CERCLA remedial actions might be required. EPA therefore designated the Keystone Corridor Site as a broadened geographic area that was added to the National Priorities List of CERCLA sites in December 2013. EPA compiles and periodically updates the National Priorities List by formal rulemaking processes, and the list is then codified at 40 C.F.R. Part 300, Appendix B.

27. The Keystone Corridor Site is located about six miles northeast of downtown Indianapolis, in an area both commercial and residential. The approximate boundaries are 45th Street on the north, Eastern Avenue on the east, 38th Street on the south, and Norwaldo Avenue on the west, with the center of the Site at the intersection of Keystone Avenue and East Fall Creek Parkway North Drive.

28. The Keystone Corridor Site includes three operable units that EPA designated for administrative management of the Site: the primary source area for the Site ("OU-1"); a Site-wide groundwater contamination plume ("OU-2"); and a Site-wide vapor intrusion area ("OU-3"). OU-2 and OU-3 extend out from OU-1 in the direction of groundwater flow.

29. The Property constitutes the entirety of OU-1. Roughly 10,000 people live within one mile of the Property and, according to EPA's environmental justice screening tool—relying on census data—the Property is in a high-priority area for environmental justice concerns.

30. The Property is the primary source area of VOCs that have contaminated soil and groundwater at and around the Keystone Corridor Site and has led to vapor intrusion in the surrounding residential neighborhood. Specifically, the residual VOC contaminants at the Property and the Site include DNAPL containing PCE, TCE, DCE, and vinyl chloride.

**EPA's Selection of a Remedial Action for OU-1 of the Site**

31. After adding the Site to the National Priorities List, EPA followed its established process for investigating and planning CERCLA remedial actions for the Site, as outlined in the agency's National Contingency Plan ("NCP") regulations codified at 40 C.F.R. Part 300. As prescribed by 40 C.F.R. section 300.430, that included: (i) completing a Remedial Investigation to assess the nature and extent of the contamination; (ii) performing a Feasibility Study to identify and evaluate a range of remedial alternatives; and (iii) proposing and selecting remedial actions for the Site in one or more formal Records of Decision, all after opportunities for public input and assembly of Administrative Records supporting the decisions.

32. EPA conducted a series of Remedial Investigation activities for OU-1 of the Site between December 2015 and March 2017, including groundwater and soil sampling, and documented elevated concentrations of PCE and TCE levels far above EPA-accepted levels. At its maximum concentration, EPA encountered PCE levels in the groundwater as high as 120,000 micrograms per liter ("ug/L") and TCE levels as high as 7,900 ug/L, whereas EPA's Maximum Contaminant Level standard for safe drinking water is much lower at only 5 ug/L for each chemical.

33. EPA also detected PCE in soil vapor in an area roughly the same size as the groundwater plume but extending several hundred feet up and downgradient of the plume, with the highest concentration beneath the Property.

34. EPA concluded that significant risks were posed to residents and workers at the Keystone Corridor Site due to these contaminants via the groundwater and vapor intrusion pathways extending off the Property.

35. EPA also prepared a Feasibility Study to evaluate remedial actions to address the contamination at the Property. The Feasibility Study created a goal of timely reducing the total mass of VOCs under the Property. After reviewing four potential response actions, the Study recommended utilizing in situ thermal treatment ("ISTT") because it is the fastest and most effective method to reduce the contamination by permanently and irreversibly reducing the source of contamination.

36. Based on the findings in the Remedial Investigation Report and Feasibility Study, EPA prepared a Proposed Plan for OU-1 that summarized its findings and its proposal to utilize ISTT to remedy the contamination at the Property. EPA originally issued that Proposed Plan for OU-1 in March 2020 but the agency reissued it in May 2020 to allow added time for public comments and a virtual public meeting during the COVID-19 pandemic.

37. The OU-1 Proposed Plan focused on environmental cleanup activities that would be performed at Sycamore's Property.

38. Sycamore did not provide any comments on EPA's Proposed Plan.

39. In October 2020, EPA prepared and issued a Record of Decision for OU-1, which summarized the issues at the Property, risks the contamination posed, the public comments it received on its Proposed Plan, and its reasoning for choosing ISTT as the remedial action for OU-1. The 2020 Record of Decision explained how ISTT works by raising the temperature of the soil and groundwater in the target treatment zone so that the contaminants are mobilized, extracted, and treated. The high temperatures will mobilize and volatize the contaminants below

the surface, which will then be removed and treated in above-ground treatment systems on the Property.

### EPA's Remedial Design for the ISTT Remedy and the Need for Access

40.     After its formal selection of the ISTT remedy in the 2020 Record of Decision, EPA completed a Remedial Design for the project, outlining the following steps required to execute and complete the cleanup: 1) secure a contractor to conduct the work; 2) construct the ISTT system; 3) operate the ISTT system; 4) sample soil and groundwater to monitor the ISTT performance; and 5) cool down and decommission the ISTT system.

41.     For the first step, EPA must secure a contractor to execute the selected remedy. This requires a bidding process, in which EPA expects multiple companies to bid for the contract, to request access to the Property for various reasons, and to ask Property-specific questions.

42.     Once a contractor is selected, that contractor will perform administrative, contractual, and logistical activities, and will make various submittals to EPA regarding its execution of the Remedial Design. This process occasionally reveals the need for revisions to existing documents or design plans and can require additional access to the Property.

43.     The second through fifth steps outlined above will take place on the Property itself, as the contractor constructs, operates, monitors, and then decommissions the ISTT system. For these steps, EPA will need unrestricted access to most of the Property because the physical aspects of the ISTT system construction and implementation will prevent any other use of certain areas of the Property.

**Sycamore's Hedging and Inconsistent Positions Regarding EPA Access**

44. EPA initially communicated with Sycamore's President and primary representative—Ibrahim Alfaran—shortly after Sycamore purchased the Property in January 2016.

45. As part of those communications, an EPA representative warned Ibrahim Alfaran that the Property was part of a Superfund site that EPA was addressing.

46. EPA secured Sycamore's written consent to access to the Property to continue conducting its then-ongoing Remedial Investigation.

47. Ibrahim Alfaran signed a consent to access agreement on Sycamore's behalf on March 9, 2016, which specifically noted that EPA and its contractors would collect samples, install groundwater monitoring wells, and take any other response action to address any release of threatened release of a hazardous substance that EPA determined might pose an imminent and substantial endangerment to the public or environment.

48. Initially, Sycamore coordinated with EPA to relocate its cars from its parking lot—the primary location covering the largest part of the VOC plume—for EPA's investigation. However, before EPA could finish sampling, Sycamore representatives began restricting access by refusing to move the company's cars or open its gates for EPA's employees and contractors.

49. In October 2021, EPA began a series of attempts to contact Sycamore to confirm that EPA would have access to the Property to prepare for implementing the remedial action selected in EPA's 2020 Record of Decision. EPA first sent a certified letter to Sycamore requesting access, but it did not receive a response.

50. EPA eventually connected with Sycamore through Ibrahim Alfaran's son and business associate, Faris Alfaran, who spoke with an EPA representative regarding the contamination at the Property and EPA's need for access for a response action.

51. On May 16, 2022, EPA and an EPA contractor met in person with Ibrahim and Faris Alfaran at the Property to explain EPA's need for access to perform its selected remedial action.

52. At the in-person meeting at the Property in May 2022, the EPA representative explained the source and extent of the contamination; the Record of Decision and the planned ISTT system; and the duration of time required to construct, operate, and then deconstruct the ISTT system on the Property.

53. At the in-person meeting at the Property in May 2022, Ibrahim Alfaran explained that he was aware that the Property was a Superfund site, but he made clear that Sycamore would not agree to give EPA exclusive access to the Property to complete the ISTT cleanup remedy.

54. Prior to filing this Complaint, the United State sent Sycamore a written communication offering the opportunity to avoid contested proceedings by entry into a Consent Judgment confirming EPA's right to access the Property, and Sycamore agreed. If approved and entered by the Court, the Consent Judgment would resolve this case on agreed terms.

**Bases for Relief Under CERCLA Section 104(e)**

55. Sycamore's Property is a facility, establishment, or other place of property: (i) from which or to which a hazardous substance or pollutant or contaminant has been or may have been released; (ii) where a further release of a hazardous substance is or may be threatened; and/or (iii) where entry is needed to determine the need for response or the appropriate response or to effectuate a response action. 42 U.S.C. § 9604(e)(3)(B)-(D).

56. EPA has determined that there have been releases or threats of a release of one or more hazardous substances, pollutants, or contaminants at the Property, including releases and threatened releases of PCE, TCE, DCE, and vinyl chloride.

57. Therefore, CERCLA grants EPA authority to have access to the Property for the purposes of "determin[ing] the need for response, or choosing or taking any response action under this subchapter, or otherwise enforcing the provisions of this subchapter." 42 U.S.C. § 9604(e)(3)(D).

58. CERCLA also grants EPA authority to have access to the Property to inspect and obtain samples from the Property. 42 U.S.C. § 9604(e)(4).

59. Once EPA gains access to the Property, CERCLA grants EPA authority to "act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to" the released hazardous substance. EPA is also authorized to "take any other response measure consistent with the national contingency plan" that EPA deems necessary to protect the public health or environment. 42 U.S.C. § 9604(a)(1).

**CLAIM FOR RELIEF UNDER 42 U.S.C. § 9604(e)**

60. The United States re-alleges and incorporates Paragraphs 1-59 herein.

61. EPA seeks an Order in Aid of Access and Final Judgment granting EPA access to the Property.

62. In accordance with CERCLA Section 104(e)(5)(B), 42 U.S.C. § 9604(e)(5)(B), the Court should enter an Order in Aid of Access and Final Judgment compelling compliance with EPA's request that EPA be allowed to enter Sycamore's Property for the purpose of performing any and all CERCLA response activities described in the 2020 Record of Decision

for OU-1 of the Keystone Corridor Site, including but not limited to activities required to plan, construct, operate, monitor, and deconstruct an ISTT system for the Property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States of America respectfully requests that this Court:

1. Issue an Access Order and Final Judgment confirming EPA's statutory right to have its employees and representatives access to the Property for the purposes outlined above.

2. In the Access Order and Final Judgement requested in Paragraph 1, enjoin Sycamore and its representatives from interfering with EPA's court-confirmed right to access the Property for the purposes outlined above.

3. Award the United States its costs of this action; and

4. Grant such other relief as this Court deems appropriate.

    TODD KIM
    Assistant Attorney General
    Environment & Natural Resources Division
    United States Department of Justice

    s/ Jessica Durney
    JESSICA DURNEY
    Environmental Enforcement Section
    Environment & Natural Resources Division
    United States Department of Justice
    P.O. Box 7611
    Washington, D.C.  20044-7611
    Phone: (202) 514-4592
    Email: jessica.durney@usdoj.gov

                                            ZACHARY A. MYERS
                                            United States Attorney
                                            Southern District of Indiana

                                            J. TAYLOR KIRKLIN
                                            Assistant United States Attorney
                                            Southern District of Indiana
                                            10 West Market Street, Suite 2100
OF COUNSEL:                         Indianapolis, IN 46204-3048

JEFFREY CAHN
Associate Regional Counsel
U.S. Environmental Protection Agency